**2017 IL 120011**


# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____


(Docket No. 120011)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant and Cross-Appellee, v.
WILLIS REESE, Appellee and Cross-Appellant.


*Opinion filed October 19, 2017.*


JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Freeman, Thomas, Garman, and Theis
concurred in the judgment and opinion.

Justice Burke concurred in part and dissented in part, with opinion.


**OPINION**

The primary issue in this appeal is whether the offense of aggravated vehicular hijacking (720 ILCS 5/18-4(a)(3) (West 2006)) requires proof that the defendant took actual physical possession of a vehicle from the driver. We hold that the offense encompasses taking actual physical possession of a vehicle but may also be

committed when a defendant exercises control of the vehicle by use of force or threat of force with the victim still present. Accordingly, we affirm in part and reverse in part the appellate court's judgment.

¶ 2                                     BACKGROUND

¶ 3        Defendant Willis Reese was charged with several offenses, including aggravated vehicular hijacking (720 ILCS 5/18-4(a)(3) (West 2006)), vehicular invasion (720 ILCS 5/12-11.1 (West 2006)), attempted armed robbery (720 ILCS 5/8-4, 18-2 (West 2006)), and escape (720 ILCS 5/31-6 (West 2006)). The public defender was appointed to represent defendant, but defendant subsequently informed the trial court that he wished to proceed *pro se*.

¶ 4        The Cook County trial court admonished defendant about his right to appointed counsel and the potential of nonextended and extended-term sentences for the charged offenses. The trial court also informed defendant that some of his sentences could run consecutively and that two of the charges alone carried a potential maximum term of 160 years. The court summarized, "Basically, you are looking at massive time if you are convicted." The trial court did not admonish defendant that any potential sentences would also be served consecutively to his natural-life sentence for his unrelated first degree murder conviction. When asked if he understood the potential penalties, defendant stated, "Perfectly, Your Honor, perfectly." After completing the admonishments, the trial court permitted appointed counsel to withdraw and defendant to represent himself.

¶ 5        Prior to jury selection, defendant asked to have his leg shackles removed before potential jurors entered the courtroom. The trial court told defendant that his hands would be free and both counsel tables would be covered with drapes to block any view of his leg shackles. Defendant expressed concern that the jurors would be able to hear the shackles if he moved. He also asserted that he was there "to do a thorough job" and he "[could] not work under these conditions." The trial court told defendant the decision on removing the shackles was within the discretion of the Department of Corrections. When defendant continued to express concern, the trial court stated, "You are preaching to the choir. All you have to do is talk to the men in charge. If you can convince those three men that you don't need leg shackles, you don't have to have them on."

¶ 6 Following a recess, defendant asked if he would be shackled "when trial officially starts." The trial court responded, "That's up to the Illinois Department of Corrections." Defendant stated, "The only way they are going to come off is by court order" and reiterated that he "cannot work under these conditions." The court asserted it would take the matter under advisement and make a decision the next day.

¶ 7 During jury selection, defendant asked the court to consider an issue without the jurors present. After the trial court removed the prospective jurors from the courtroom, defendant stated he believed two of them saw his leg shackles through an area of the counsel table left uncovered by the drapes. The trial court brought those potential jurors into the courtroom separately. The first one stated she could not see behind the drapes. Defendant, nevertheless, removed her with a peremptory challenge. The second potential juror stated he saw "a little belt on [defendant's] strap between his feet," but assured the court that what he saw would not affect his ability to be fair. After questioning the prospective juror, defendant decided not to challenge him for cause or exercise a peremptory challenge.

¶ 8 When the three remaining members of the panel were brought back into the courtroom, the court asked if anything about defendant's appearance "with this drapery in front of him" would affect their ability to be fair. One of the potential jurors responded, "No I guess" and asked if there was "something we should know that we don't know because now I am confused." The trial court stated there was nothing the jurors should know. The other two potential jurors did not respond to the court's inquiry. The parties then accepted the four-member panel.

¶ 9 After concluding *voir dire*, the trial court addressed the State's motion to introduce defendant's prior murder conviction as evidence of his motive to escape and for impeachment if defendant chose to testify. The State sought to present a certified copy of the charging instrument from defendant's prior murder case to prove that he was found guilty three days before trying to escape and "to introduce evidence of the potential sentence he was facing insofar as it relates to motive." The trial court ruled that evidence could not be presented in the State's case-in-chief but a certified copy of defendant's prior murder conviction could be used for impeachment if he chose to testify.

¶ 10    The next day, the trial court ordered removal of defendant's shackles during trial. The State called Cook County sheriff's Deputy Vito Zaccaro, who testified that he was working in the external operations unit at John H. Stroger, Jr., Hospital of Cook County (Stroger Hospital) when he met defendant at the front of the hospital to accompany him to an appointment. Defendant was wearing a Department of Corrections inmate uniform and was restrained with handcuffs and leg shackles. Zaccaro transported defendant to the dermatology clinic on the second floor. Defendant repeatedly asked to use the restroom during the appointment. After the appointment, Zaccaro took defendant to a single-occupancy restroom and allowed him to enter with his hands uncuffed but his legs still shackled. Zaccaro waited in the hallway outside with the restroom door "open about a crack."

¶ 11    When defendant came out after about 10 minutes, Officer Zaccaro asked him to put his hands out, but defendant instead "jumped toward the one side with a silver metal weapon, placed it to [Zaccaro's] neck and said 'move or I'll cut you.' " Zaccaro felt defendant's hand going toward his handgun, and he threw up his arms to prevent defendant from taking the gun. Defendant responded by stabbing Zaccaro in the neck. Zaccaro struggled to detain defendant, but he tripped over defendant's shackles, and they both fell to the floor. When defendant got up and began running, Zaccaro hit the "panic button" on his radio and chased defendant through the hallways and down an emergency stairwell, exiting at the front of Stroger Hospital.

¶ 12    Zaccaro followed defendant out of the hospital and saw him run onto a shuttle bus nearby. Zaccaro tried to enter the bus, but the door slammed on him and the bus began to travel around the circular driveway before it "just kind of stopped and went into a wall." Defendant ran out of the bus, and hospital police officers tackled him. On cross-examination, Zaccaro acknowledged that defendant never made a verbal demand for Zaccaro's handgun and he also had keys to the handcuffs and leg shackles on his belt.

¶ 13    James Rimmer testified that he was the driver of the shuttle bus and was making runs between the Cook County juvenile court parking lot and Stroger Hospital. The shuttle bus was parked near one of the main entrances to the hospital with the doors open when defendant, wearing a jail inmate uniform, ran through the front door. Rimmer testified that defendant "stood over me, left hand, I guess, behind my seat,

and right hand in front of my face. I seen an object in his hand, and he ordered me to drive. He said, '*** [D]rive. If you stop, I'm gonna stab you in the neck.' " Rimmer closed the door to the bus and began driving. After driving a short distance, Rimmer opened the door, causing the bus to stop suddenly. When defendant stumbled forward, Rimmer grabbed his arm and tried to hold him until police arrived. As they wrestled, defendant stabbed Rimmer twice in the face and once in the chest with a downward motion. Defendant then broke free, ran through the front door of the bus, and was tackled by police officers. On cross-examination, Rimmer testified that defendant never got behind the wheel of the bus or gave directions on where to drive. Rimmer nonetheless thought he was a hostage during the incident.

¶ 14    Sergeant Gregory Hardin of the Cook County hospital police testified that he received a radio call about an escaped prisoner and ran toward the main entrance with two or three other officers. Upon arriving at the entrance, they were directed to the shuttle bus. They ran to the bus as it stopped and observed defendant striking the driver with a downward motion. Sergeant Hardin entered the bus through the rear door and ordered defendant to stop and get down. Defendant turned toward the front door of the bus and was arrested by the other officers.

¶ 15    After denying defendant's motion for a directed verdict, the trial court admonished defendant about his right to testify and reminded him that his prior murder conviction could be used to impeach his credibility if he chose to testify. Defendant asked, "How far does that play out?" The court responded that the State could not talk about the facts of that case but would be able to introduce evidence that defendant was convicted of first degree murder and the date of the conviction. The court also advised defendant that if he testified about a necessity defense, claiming he tried to escape because he had been beaten by jail guards, the State would be allowed to rebut that claim of motive with his murder conviction.

¶ 16    Defendant decided to testify. He first discussed his prior murder conviction and maintained he did not commit that offense. He stated that prior to his escape attempt he had spent 4½ years in the Cook County jail. Defendant described the conditions in the jail as "terrible" and "appalling" and asserted that he only tried to escape because he was suffering, his health was failing, and he had been beaten by jail guards about one year before his murder trial. Defendant stated he was hospitalized for three days following the attack, recovering from bruising, cuts, and

severe injuries to his eye. Defendant testified one of the guards threatened to beat him again. After he was found guilty of murder, defendant knew he had to escape to save himself and others who were also suffering in the jail. Defendant testified that he tried to escape because he felt his life was in danger and he also wanted to alert the authorities to help others suffering in the jail. Defendant realized he was "going to be one of these guys who sits in prison for 30 years, you know, on something that he didn't do."

¶ 17 Defendant denied trying to take Officer Zaccaro's handgun, explaining that he was only trying to take the keys to unlock his leg shackles. Defendant testified he jumped on the bus and asked the driver for help. The bus driver agreed and began driving, but when defendant saw the officers approaching the bus he "knew the gig was up" and told the driver to open the door. As defendant turned to exit the bus, the driver attacked him, a "physical altercation" ensued, and "during the process *** [defendant] accidentally hit him with the knife." Defendant then surrendered to the police officers and was arrested.

¶ 18 On cross-examination, the State asked if the alleged beating by the guards occurred while defendant was in jail "[o]n the charges, among other things of first degree murder." Defendant agreed and also acknowledged that a jury had found him guilty of that offense. The State further asked whether the jury found defendant personally discharged a firearm that caused the victim's death. Defendant responded, "Oh, yeah. And when they did that, when they did that, sir." The State asked, "Is that what they found?" and defendant replied, "Not that I know of. *** I thought it was something different than that."

¶ 19 The prosecutor then asked, "[A]fter being found guilty of first degree murder three days before your escape and with the additional finding that you shot your victim to death, you were looking at a potential sentence of 45 years to the rest of natural life in prison?" After the trial court overruled defendant's objection, he responded that he was found guilty of a crime he did not commit. Defendant acknowledged that he knew the potential sentence but claimed it "didn't mean anything" to him, and he intended to escape only to avoid being beaten again. The State subsequently asked defendant if he was "charged with a felony murder among other things," and defendant responded that he was "charged with murder." Defendant denied attempting to force the bus driver to drive away. Rather, he asked

the driver, and the driver agreed. Defendant stated he never threatened the bus driver with the knife but was only holding it because he had tried to remove his shackles with it.

¶ 20    In rebuttal, the trial court granted the State's motion to admit into evidence a certified statement of conviction and disposition indicating that defendant was found guilty of first degree murder on March 19, 2007. In discussing the evidence to give to the jury, the prosecutor subsequently asserted, "I believe we were going to send back all our exhibits except for the grand jury transcript and the certified copy." The trial court stated, "Right. The grand jury transcript doesn't go back, everything else does."

¶ 21    The jury found defendant guilty of aggravated vehicular hijacking, unlawful vehicular invasion, attempted armed robbery, and escape. Defendant was sentenced to concurrent extended-term sentences of 50 years for aggravated vehicular hijacking, 30 years for vehicular invasion, 30 years for attempted armed robbery, and 14 years for escape. The trial court ordered those sentences to run consecutively to defendant's sentence for murder.

¶ 22    On appeal, defendant maintained, among other things, that his aggravated vehicular hijacking conviction must be reversed because he did not "take" the bus within the meaning of the aggravated vehicular hijacking statute. Defendant argued the statute requires proof that he actually dispossessed the shuttle bus from the driver. Defendant contended that merely forcing the driver to drive the bus was insufficient.

¶ 23    The appellate court agreed with defendant, holding that the taking element of aggravated vehicular hijacking is established only when a defendant " ' "cause[s] the victim to part with possession or custody of [the vehicle] against his will." ' " 2015 IL App (1st) 120654, ¶ 58 (quoting *People v. Strickland*, 154 Ill. 2d 489, 526 (1992), quoting *People v. Smith*, 78 Ill. 2d 298, 303 (1980)). While defendant may have deprived the driver of a measure of control over the vehicle, there was no evidence that he took possession of the bus or removed it from the driver's custody. 2015 IL App (1st) 120654, ¶ 59. The appellate court, therefore, concluded that defendant's aggravated vehicular hijacking conviction must be reversed because the State failed to prove the taking element of that offense beyond a reasonable doubt. 2015 IL App (1st) 120654, ¶ 59. The appellate court also held that

defendant's sentence for escape must be reduced to a nonextended term of seven years' imprisonment but otherwise affirmed the trial court's judgment. 2015 IL App (1st) 120654, ¶¶ 130, 132.

¶ 24        Justice Palmer dissented in part, asserting that a defendant can "take" a vehicle within the meaning of the aggravated vehicular hijacking statute without physically dispossessing the vehicle from the victim. 2015 IL App (1st) 120654, ¶ 156 (Palmer, J., specially concurring in part and dissenting in part). According to the partial dissent, the majority's narrow construction of the statute produced an absurd result because it failed to include the circumstances of this case where defendant obtained control of the vehicle. 2015 IL App (1st) 120654, ¶¶ 156-57 (Palmer, J., specially concurring in part and dissenting in part). The partial dissent would have held the evidence was sufficient to establish that defendant took the vehicle within the meaning of the aggravated vehicular hijacking statute. 2015 IL App (1st) 120654, ¶ 157 (Palmer, J., specially concurring in part and dissenting in part).

¶ 25        We allowed the State's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Jan. 1, 2015)).

¶ 26                                II. ANALYSIS

¶ 27            A. Construction of the Aggravated Vehicular Hijacking Statute

¶ 28        On appeal to this court, the State contends that the appellate court construed the aggravated vehicular hijacking statute far too narrowly. The State maintains that the statutory language does not require an offender to remove a vehicle from the driver's possession but may also be satisfied when, as here, the defendant exercises control over the vehicle by use of force. The State contends the appellate court ignored the plain meaning and purpose of the statute. Further, its decision excludes the most dangerous conduct from the statute's scope because the greatest risk of harm occurs when a victim remains in the vehicle with the assailant during the offense. The State contends that defendant's actions fall squarely within the conduct prohibited by the statute when construed properly.

¶ 29        Defendant responds that the phrase "takes from" in the vehicular hijacking statute plainly requires physical dispossession of the vehicle from the driver. In

*Strickland*, this court held that robbery of a vehicle occurred only when the defendant removed the vehicle from the victim's actual possession. *Strickland*, 154 Ill. 2d at 526. The legislature subsequently used the language from the robbery statute in enacting the vehicular hijacking statute. Defendant concludes that because the legislature used the language from the robbery statute in creating the vehicular hijacking offense, this court's construction of that language in *Strickland* controls the interpretation of the vehicular hijacking statute.

¶ 30     This issue presents a question of statutory construction subject to *de novo* review. *People v. Grant*, 2016 IL 119162, ¶ 20. The fundamental objective of statutory construction is to ascertain and give effect to the legislature's intent. *People v. Pearse*, 2017 IL 121072, ¶ 41. The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning. *People v. Cherry*, 2016 IL 118728, ¶ 13. In discerning legislative intent, we may consider the purpose of the statute, the problems to be remedied, and the consequences of interpreting the statute one way or another. *People v. Bradford*, 2016 IL 118674, ¶ 15. A reviewing court may also consider the circumstances existing when the statute was enacted, contemporaneous conditions, and the goals sought to be achieved. *People v. Johnson*, 2017 IL 120310, ¶ 15. We presume that the legislature did not intend absurd, inconvenient, or unjust results. *People v. Williams*, 2016 IL 118375, ¶ 15. The rule of lenity requires that any ambiguity in a criminal statute must be resolved in a manner favoring the accused, but that rule must not be stretched to defeat the legislature's intent. *Pearse*, 2017 IL 121072, ¶ 39.

¶ 31     The offense of vehicular hijacking is committed when a person "takes a motor vehicle from the person or the immediate presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18-3(a) (West 2006). Vehicular hijacking is a Class 1 felony (720 ILCS 5/18-3(c) (West 2006)). The offense is enhanced to aggravated vehicular hijacking, a Class X felony with a minimum sentence of seven years' imprisonment, if committed while the offender is armed with a dangerous weapon other than a firearm (720 ILCS 5/18-4(a)(3), (b) (West 2006)).

¶ 32     As defendant points out, in *Strickland* this court addressed similar language in the robbery statute. In that case, the defendant and his brother encountered a man

parked in front of a house in Buffalo Grove and ordered him at gunpoint to drive them to California. The man drove instead to the downtown area of Chicago and stopped in front of a marked police car at an intersection. When the man got out of the car to alert the police officer, the defendant and his brother fled on foot and were later apprehended. *Strickland*, 154 Ill. 2d at 499-500. The defendant was charged with several offenses, including armed robbery of a vehicle. The robbery statute in effect at the time provided that " '[a] person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force.' " *Strickland*, 154 Ill. 2d at 523 (quoting Ill. Rev. Stat. 1985, ch. 38, ¶ 18-1(a)). The offense was enhanced to armed robbery when committed while armed with a dangerous weapon. *Strickland*, 154 Ill. 2d at 523 (citing Ill. Rev. Stat. 1985, ch. 38, ¶ 18-2(a)).

¶ 33    The defendant contended there was no evidence that he took the vehicle from the driver as required to sustain the offense of armed robbery because the driver operated the vehicle at all times during the incident. *Strickland*, 154 Ill. 2d at 525. This court agreed, asserting that " '[t]he taking by force or the threat of force is the gist of the offense' " of armed robbery. *Strickland*, 154 Ill. 2d at 525-26 (quoting Ill. Ann. Stat., ch. 38, ¶ 18-1, Committee Comments, at 113 (Smith-Hurd Supp. 1992)). "[T]he offense 'is complete when force or threat of force causes the victim to part with possession or custody of property against his will [citation].' " *Strickland*, 154 Ill. 2d at 526 (quoting *Smith*, 78 Ill. 2d at 303). Although the defendant deprived the driver of a large measure of control over his vehicle, there was no evidence that the vehicle was ever taken from the driver or removed from his actual possession. This court, therefore, reversed the defendant's conviction of armed robbery because the evidence was insufficient to establish the taking element of that offense. *Strickland*, 154 Ill. 2d at 526.

¶ 34    The vehicular hijacking statute became effective in 1993 (Pub. Act 88-351, § 5 (eff. Aug. 13, 1993)), less than one year after this court issued its decision in *Strickland*. At the same time, the legislature amended the robbery statute to exclude motor vehicles from its scope. The amended robbery statute provided that "[a] person commits robbery when he or she takes property, *except a motor vehicle covered by Section 18-3 or 18-4*, from the person or presence of another by the use of force or by threatening the imminent use of force." (Emphasis added.) 720 ILCS 5/18-1 (West 2006).

¶ 35　　Subsequently, in *People v. McCarter*, 2011 IL App (1st) 092864, the appellate court relied on *Strickland* in construing the vehicular hijacking statute. The appellate court observed that, under *Strickland*, taking a large measure of control over a vehicle is insufficient to establish the offense of armed robbery. *McCarter*, 2011 IL App (1st) 092864, ¶ 77. The appellate court held that, as with armed robbery, the vehicular hijacking statute also requires a defendant to dispossess the vehicle from the victim. *McCarter*, 2011 IL App (1st) 092864, ¶¶ 77-78. Although the defendant forced the victim to drive his vehicle at gunpoint, the evidence did not establish that the victim was ever dispossessed of his car. *McCarter*, 2011 IL App (1st) 092864, ¶ 78. Accordingly, the appellate court concluded that the State failed to prove the offense of vehicular hijacking. *McCarter*, 2011 IL App (1st) 092864, ¶ 79.

¶ 36　　The *McCarter* court viewed *Strickland* as controlling the construction of the vehicular hijacking statute. We believe *Strickland* is distinguishable, however, for the simple reason that in *Strickland* we construed the armed robbery statute, not the vehicular hijacking statute. The vehicular hijacking statute was not even enacted until approximately one year after *Strickland*.

¶ 37　　Our construction of the armed robbery statute in *Strickland* was based largely on the common-law understanding of that offense. This court discussed the use of force or threat of force in taking property as "the gist of the offense." (Internal quotation marks omitted.) *Strickland*, 154 Ill. 2d at 525. This court has previously stated that "[t]he gist of the offense of robbery, both at common law and under the statute of this State" is the force or intimidation used in taking property against a person's will. *People v. Casey*, 399 Ill. 374, 377 (1948) (citing *People v. Kubish*, 357 Ill. 531 (1934)); *People v. Stathas*, 356 Ill. 313 (1934)). The common-law understanding of the offense of robbery as requiring the defendant to remove property from the victim's possession through the use of force or the threat of force is specific to that offense. The vehicular hijacking offense is not derived from the common law but was newly enacted in 1993. Accordingly, we find the analysis in *Strickland* is inapposite to the proper construction of the vehicular hijacking statute.

¶ 38　　Ultimately, we must determine what the legislature intended in enacting the new, separate offense of vehicular hijacking. Defendant contends that by creating

the vehicular hijacking offense, the legislature intended to punish the taking of a motor vehicle more harshly than the taking of other property. Defendant observes that robbery is generally a Class 2 felony (720 ILCS 5/18-1(b) (West 2006)) while vehicular hijacking is a Class 1 felony (720 ILCS 5/18-3(c) (West 2006)). Defendant therefore concludes that vehicular hijacking is simply robbery of a vehicle with a harsher penalty than for robbery of other property. We disagree.

¶ 39       If the legislature had intended only to punish robbery of a motor vehicle more harshly, it could have simply included an enhanced punishment for that offense within the robbery statute. The robbery statute in effect at the time of this offense enhanced the penalty to a Class 1 felony if the victim was 60 years of age or over or was physically handicapped or when the offense was committed in a school or a place of worship. 720 ILCS 5/18-1(b) (West 2006). The legislature could have added robbery of a motor vehicle to that list if its intention was to treat that offense more harshly. Instead, the legislature removed motor vehicles from the robbery statute and created an entirely new offense entitled "vehicular hijacking." Because the legislature created a new offense, we necessarily reject defendant's argument that it only intended to punish robbery of a motor vehicle more harshly.

¶ 40       Rather, in creating the new offense of vehicular hijacking, the legislature plainly intended to address criminal conduct distinct from robbery of a motor vehicle. We believe the legislature not only intended to encompass situations when a victim is actually dispossessed of a vehicle but also intended more broadly to include circumstances when the defendant takes a vehicle by exercising control. In the context of vehicular hijacking, exercising control over a vehicle by directing the driver through the use of force or the threat of force falls within the plain statutory language requiring the offender to "take[ ] a motor vehicle from the person or the immediate presence of another." 720 ILCS 5/18-3(a) (West 2006).

¶ 41       The consequences of interpreting the statute one way or another also support our construction. See *Bradford*, 2016 IL 118674, ¶ 15. Undoubtedly, a victim may be subject to greater risk of violence if he or she remains in the vehicle with the offender. See *United States v. DeLaCorte*, 113 F.3d 154, 156 (9th Cir. 1997) (a victim who is forced to stay in a car and is subjected to the assailant's continuing threats and possible violence will often be placed in greater danger than a victim who is released immediately). Given the greater risk of harm, we do not believe the

legislature intended to exclude from the scope of the vehicular hijacking statute the forceful taking of a vehicle while the driver remains inside.

¶ 42    In sum, we conclude that the legislature did not intend merely to enact a separate statute for robbery of a motor vehicle. The legislature also intended to criminalize taking control of a vehicle by force or threat of force, including when the victim remains inside the vehicle. Accordingly, the appellate court's decision to the contrary in *McCarter* must be overruled.

¶ 43    Defendant's actions of threatening the shuttle bus driver with a knife and ordering him to drive fall squarely within the conduct prohibited by the vehicular hijacking statute. Defendant took control of the bus from the driver by the threat of force. We conclude that the evidence was sufficient to establish the offense of aggravated vehicular hijacking. Accordingly, the appellate court's judgment is reversed on that point.

¶ 44                          B. Shackling During Jury Selection

¶ 45    In his cross-appeal, defendant renews several issues he raised in the appellate court. First, defendant argues he was deprived of due process by being shackled during jury selection. Defendant contends the appellate court erred in finding the violation of his right to due process harmless beyond a reasonable doubt because the shackles interfered with his self-representation and prejudiced him in the eyes of the jury. The State concedes that the trial court erred in allowing defendant to be shackled during jury selection without first making an express determination that restraints were necessary but contends that defendant was not prejudiced by the error.

¶ 46    This court has long held that the use of physical restraints in court is warranted only when there has been a showing of manifest need for the restraints. *People v. Allen*, 222 Ill. 2d 340, 347 (2006) (citing *People v. Boose*, 66 Ill. 2d 261, 265-66 (1977)). Physical restraints should be avoided whenever possible because they tend to prejudice the jury against the defendant, hinder the defendant's ability to assist counsel, and offend the dignity of the judicial process. *In re Staley*, 67 Ill. 2d 33, 36 (1977) (citing *Boose*, 66 Ill. 2d at 265-66). A defendant may be shackled when there is reason to believe that he or she may try to escape, that he or she may pose a

- 13 -

threat to the safety of people in the courtroom, or when necessary to maintain order during the trial. *Boose*, 66 Ill. 2d at 266.

¶ 47 The decision on whether and how to restrain a defendant is left to the trial court's discretion. *Allen*, 222 Ill. 2d at 348. The trial court should state on the record the reasons for allowing the defendant to remain shackled, and the defendant's attorney should be given an opportunity to present reasons why the defendant should not be restrained. *Boose*, 66 Ill. 2d at 266. A defendant may not be tried in shackles in either a bench trial or a jury trial absent a showing that restraints are necessary. *In re Staley*, 67 Ill. 2d at 38. The showing of manifest need for restraints must be established clearly on the record. *In re Staley*, 67 Ill. 2d at 38.

¶ 48 This court has codified the holdings in *Boose* and *Allen* in Illinois Supreme Court Rule 430 (eff. July 1, 2010). Rule 430 states that after becoming aware of restraints, the trial court must conduct a separate hearing to investigate whether they are necessary. The trial court must allow the defendant to be heard and must make specific findings on enumerated factors before permitting the use of restraints.

¶ 49 In this case, the trial court did not conduct a hearing or articulate any reason for shackling defendant during jury selection. Rather, the trial court deferred to the judgment of the Department of Corrections. When considering similar circumstances in *Allen*, this court stated, "this abdication of the trial court's responsibility is not acceptable." *Allen*, 222 Ill. 2d at 348-49. Here, the trial court clearly abused its discretion in allowing defendant to be shackled during jury selection without making a determination of manifest need for the restraints. The trial court's failure to follow the procedure established in *Boose* and subsequently codified in Rule 430 resulted in a violation of defendant's right to due process. *Allen*, 222 Ill. 2d at 349.

¶ 50 Citing *Deck v. Missouri*, 544 U.S. 622, 635 (2005), defendant contends that the shackling error cannot be considered harmless beyond a reasonable doubt. In *Deck*, the Supreme Court stated that shackling is inherently prejudicial and will often have negative effects that are not apparent from the trial transcript. *Deck*, 544 U.S. at 635. To establish that the due process violation was harmless, "[t]he State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not

contribute to the verdict obtained.' " *Deck*, 544 U.S. at 635 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

¶ 51   We recognize that physical restraints affect several interests, including the defendant's presumption of innocence, the ability to assist counsel, and the dignity of the court proceedings. *Deck*, 544 U.S. at 630-32; *In re Staley*, 67 Ill. 2d at 36; *Boose*, 66 Ill. 2d at 265. We believe the impact of the shackling error on those interests was mitigated, however, by the specific facts of this case.

¶ 52   First, we note that the trial court ordered removal of the shackles following jury selection and defendant represented himself without any physical restraints throughout the remainder of the trial. During jury selection, the trial court placed skirting around both counsel tables to block the view of the shackles. The record shows that one prospective juror saw the shackles under the table, but there is no showing that any of the remaining jurors were aware of the shackles. Upon questioning by the trial court and defendant, the prospective juror who saw the shackles stated it would not affect his ability to be fair. After questioning the juror, defendant did not challenge him for cause or exercise a peremptory challenge. Thus, defendant was apparently satisfied that the juror could remain impartial. In this case, we believe the limited use of the shackles and the effort to block them from view reduced the impact of the error on defendant's presumption of innocence.

¶ 53   While defendant complained about the impact of the shackles on his ability to represent himself, stating he "[could] not work under these conditions," the record shows he questioned the prospective jurors extensively during *voir dire* and made peremptory challenges. A review of the record indicates defendant was not hindered in protecting his rights during jury selection despite the presence of the shackles.

¶ 54   As for the dignity of the court proceedings, that interest includes respectful treatment of defendants, reflecting the importance of the determination of a defendant's guilt or innocence. *Deck*, 544 U.S. at 631. The routine use of shackles in the presence of juries undermines those interests. *Deck*, 544 U.S. at 631. Here, however, the shackles were not generally visible to observers in the courtroom. We find that the trial court's placement of skirting around both counsel tables at least reduced the impact of the shackling error on the dignity of the court proceedings.

¶ 55    Finally, we consider the evidence presented against defendant. Defendant was caught in the act of trying to escape from custody by hijacking the shuttle bus. He injured several people during his escape attempt. Although a necessity defense may be available when an inmate escapes to avoid injury while in custody (*People v. Unger*, 66 Ill. 2d 333, 340-41 (1977)), defendant's necessity defense depended on convincing the jury that he had to escape to avoid the jail conditions he had already endured for 4½ years. The alleged beating by jail guards that defendant claimed motivated his escape attempt occurred one year before he tried to escape. The State rebutted defendant's necessity defense with proof that he was just convicted of first degree murder and was facing at least 45 years' imprisonment, thus providing a more plausible motive for his escape attempt. We conclude that the State presented overwhelming evidence against defendant.

¶ 56    The shackling error in this case was unquestionably serious. The trial court's failure to follow the procedure established in *Boose* and later codified in Illinois Supreme Court Rule 430 resulted in a due process violation. Given the specific facts of this case, however, we are convinced that the shackling error did not contribute to defendant's convictions. See *Deck*, 544 U.S. at 635. Accordingly, we agree with the appellate court that the error was harmless beyond a reasonable doubt.

¶ 57                        C. Defendant's Waiver of Counsel

¶ 58    Next, defendant contends that his waiver of counsel was invalid because the trial court did not inform him that any sentence in this case would be served consecutively to his sentence for murder, as required by Illinois Supreme Court Rule 401(a) (eff. July 1, 1984). Defendant contends the failure to comply with Rule 401(a) requires reversal of his convictions and remand for a new trial.

¶ 59    The State responds that defendant forfeited this claim by failing to include it in his motion for a new trial and he is not entitled to relief under the plain error rule. The State further contends that Rule 401(a) only requires substantial compliance and the trial court met that standard by adequately advising defendant of the consequences of waiving counsel.

¶ 60 Defendant did not raise this issue in his motion for a new trial. To preserve an issue for review, a defendant must object at trial and raise the alleged error in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). A reviewing court may, however, address a forfeited claim under the plain error doctrine when

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)).

In applying the plain error doctrine, it is appropriate to first determine whether a clear or obvious error occurred. *People v. Smith*, 2016 IL 119659, ¶ 39.

¶ 61 Illinois Supreme Court Rule 401(a) governs the trial court's acceptance of a defendant's waiver of counsel. *People v. Haynes*, 174 Ill. 2d 204, 235 (1996). Rule 401(a) provides:

> "(a) Waiver of Counsel. Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
>
> > (1) the nature of the charge;
> >
> > (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and
> >
> > (3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 62 The purpose of the rule is " 'to ensure that a waiver of counsel is knowingly and intelligently made.' " *People v. Campbell*, 224 Ill. 2d 80, 84 (2006) (quoting *Haynes*, 174 Ill. 2d at 241). Strict, technical compliance with the rule is not always

- 17 -

required, however. *Haynes*, 174 Ill. 2d at 236. Substantial compliance is sufficient for a valid waiver of counsel if the record indicates the waiver was made knowingly and intelligently and the trial court's admonishment did not prejudice the defendant's rights. *People v. Kidd*, 178 Ill. 2d 92, 113 (1997) (citing *Haynes*, 174 Ill. 2d at 236, *People v. Coleman*, 129 Ill. 2d 321, 333 (1989), and *People v. Johnson*, 119 Ill. 2d 119, 132 (1987)). Each waiver of counsel must be assessed on its own particular facts. *Haynes*, 174 Ill. 2d at 242.

¶ 63    After defendant moved to discharge his appointed attorney, the trial court admonished him about his right to counsel and the potential nonextended and extended-term sentences for the charged offenses. Defendant was also informed that some of his sentences could run consecutively. The trial court told defendant that two of the charges alone carried a potential maximum penalty of 160 years. The court stated, "Basically, you are looking at massive time if you are convicted." When asked if he understood the potential penalties, defendant stated, "Perfectly, Your Honor, perfectly."

¶ 64    Defendant contends that the trial court failed to provide a sufficient admonition that his sentences would run consecutively to his existing natural-life sentence for murder, but there is no indication in the record that the trial court's failure to admonish defendant on that point affected his decision to waive his right to counsel. Defendant was informed that he was facing "massive time" if convicted of even some of the charged offenses in this case. The trial court told defendant that the maximum sentence was 160 years' imprisonment on two of the charges alone. The trial court's admonition surely impressed upon defendant the gravity of the potential punishments. We fail to see how informing defendant that the potential 160-year sentence in this case would also be served consecutively to his natural-life sentence for murder could have affected his decision on whether to waive counsel and proceed *pro se*.

¶ 65    The record here shows that defendant's waiver of counsel was made knowingly and intelligently and the admonitions did not prejudice his rights. See *Kidd*, 178 Ill. 2d at 113 (citing *Haynes*, 174 Ill. 2d at 236, *Coleman*, 129 Ill. 2d at 333, and *Johnson*, 119 Ill. 2d at 132). The trial court carefully admonished defendant about the charges, the possible punishments, and his right to counsel. We do not believe any error in the admonishment on consecutive sentencing could have misled

defendant or caused him to waive his right to counsel unknowingly. Based on the record, including the trial court's detailed admonishments under Rule 401(a), we conclude that defendant's waiver of counsel was valid. Defendant has not established a clear or obvious error required for relief under the plain error doctrine. Accordingly, defendant is not entitled to reversal of his convictions on this ground.

¶ 66                    D. Details About Prior Murder Conviction

¶ 67       Defendant argues that the certified copy of conviction introduced by the State contains excessive and irrelevant details about his prior murder conviction. Defendant contends the jury was given the certified copy of conviction revealing that he faced additional charges, was ordered to complete fitness examinations, was found guilty on seven counts of murder even though there was only one victim, was sentenced to life in prison, and filed an unsuccessful appeal and postconviction petition. Defendant further contends that on cross-examination, the prosecutor elicited that he faced other charges in addition to murder and asked if he personally discharged a firearm causing the victim's death. In closing argument, the prosecutor stated that defendant personally discharged the firearm. Defendant argues he is entitled to a new trial because he was prejudiced by this "irrelevant surplusage."

¶ 68       As noted previously, to preserve an issue for appeal a defendant must make a contemporaneous objection at trial and raise the issue in a written posttrial motion. *Enoch*, 122 Ill. 2d at 186. Defendant concedes that he did not object at trial to the challenged evidence, other than to one of the prosecutor's questions about discharging the firearm. Defendant also acknowledges that he did not include any of these issues in his motion for a new trial. Defendant has, therefore, forfeited his claims.

¶ 69       A reviewing court may address a forfeited issue under the plain error rule when

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless

- 19 -

of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565 (citing *Herron*, 215 Ill. 2d at 186-87).

The defendant bears the burden of persuasion under both prongs of the plain error doctrine. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The defendant must first establish that a clear or obvious error occurred. *People v. McLaurin*, 235 Ill. 2d 478, 497-98 (2009).

¶ 70    Initially, we observe that the fact of defendant's prior murder conviction and the potential sentence he faced for that offense were introduced to rebut defendant's necessity defense. Defendant testified that he only tried to escape because he was suffering, had been beaten by jail guards, and believed his life was in danger. Before he testified, the trial court advised defendant that the prior murder conviction would be admissible to rebut his claim of motive if he testified to a necessity defense. The evidence that defendant was found guilty of murder just three days before the escape attempt and that he was facing a potential natural-life sentence was clearly relevant to defendant's motive to escape. We conclude that evidence was properly offered to rebut defendant's testimony. See *People v. Hood*, 213 Ill. 2d 244, 259-61 (2004) (testimony tending to explain, contradict, or disprove the defendant's evidence is generally admissible in rebuttal); *People v. Lucas*, 132 Ill. 2d 399, 434-35 (1989).

¶ 71    As for the additional details of the murder case contained in the certified copy of conviction, the appellate court held that the record failed to support defendant's claim that the jury was given the certified copy. 2015 IL App (1st) 120654, ¶ 116. While discussing the evidence to give to the jury, the prosecutor stated, " 'I believe we were going to send back all our exhibits except for the grand jury transcript and the certified copy.' " The trial court responded, " 'Right. The grand jury transcript doesn't go back, everything else does.' " The appellate court concluded that reading the trial court's response with the prosecutor's comment revealed "that the State did not give the jury the certified copy of conviction." 2015 IL App (1st) 120654, ¶ 116. The appellate court declined to speculate that the certified copy was actually brought to the jury room. 2015 IL App (1st) 120654, ¶ 116.

¶ 72    We agree with the appellate court that the record is ambiguous on whether the certified copy was actually given to the jury. The plain error doctrine is a narrow and limited exception to forfeiture. *People v. Bannister*, 232 Ill. 2d 52, 65 (2008).

On plain error review, the defendant has the burden of establishing a clear or obvious error. *McLaurin*, 235 Ill. 2d at 497-98. " '[T]he plain error exception will be invoked only where the record *clearly* shows that an alleged error affecting substantial rights was committed.' " (Emphasis in original.) *Hillier*, 237 Ill. 2d at 549 (quoting *People v. Hampton*, 149 Ill. 2d 71, 102 (1992)). We cannot find a clear or obvious error occurred without a showing that the certified copy of conviction was actually submitted to the jury.

¶ 73        Defendant's remaining claims are based on the State's cross-examination and closing argument. The State elicited from defendant on cross-examination that he was facing charges of first degree murder, "among other things." The State also asked defendant if the jury found he personally discharged a firearm causing death, and the prosecutor repeated that claim in closing argument. Defendant contends the complained-of statements are prejudicial and irrelevant to either impeachment or his motive to escape.

¶ 74        In response, the State argues that defendant presented detailed testimony about the murder and repeatedly asserted he did not commit that crime. Given defendant's wide-ranging testimony about the murder, the State contends that it was entitled to ask about the details of that offense on cross-examination.

¶ 75        The trial court overruled one objection made by defendant to a question on whether the jury found he personally discharged the firearm. The trial court was not given an opportunity to rule on the other points because defendant failed to object. A trial court's decisions on the admissibility of evidence and the scope of cross-examination on an appropriate subject of inquiry are reviewed for abuse of discretion. *People v. Chambers*, 2016 IL 117911, ¶ 75. We agree with the appellate court that the additional information about defendant's prior murder case may have been relevant to rebut his testimony about the details of that conviction, including his repeated claims that he did not commit that crime. Acting *pro se*, defendant offered wide-ranging testimony in narrative form on direct examination. The prosecutor's questions about whether the jury found defendant personally discharged the firearm could have been relevant to rebut his repeated claims of innocence. See *People v. Harris*, 231 Ill. 2d 582, 588-89 (2008) ("[t]here is no question that a defendant can open the door to the admission of evidence that, under ordinary circumstances, would be inadmissible"). We cannot say the trial court

abused its discretion in overruling the objection to the State's questioning on that point.

¶ 76    We also agree with the appellate court that the reference to defendant being charged with murder, "among other things," was a brief, passing remark. Even if improper, the reference cannot be viewed as particularly prejudicial. In sum, we conclude that even if any of the complained-of evidence or closing argument was improper, defendant has not satisfied his burden of establishing plain error under either prong of the plain error doctrine. Accordingly, defendant's forfeiture of these challenges cannot be excused.

¶ 77                        E. Vehicular Invasion Conviction

¶ 78    Defendant raises two separate challenges to his vehicular invasion conviction. First, he claims the State failed to prove him guilty of that offense because there was no evidence that he entered the shuttle bus by force. Defendant also contends that if this court affirms his conviction of aggravated vehicular hijacking, the separate conviction of vehicular invasion must be vacated under the one-act, one-crime rule. The State concedes that, in the event the aggravated vehicular hijacking conviction is sustained, defendant's conviction of vehicular invasion must be vacated under the one-act, one-crime rule.

¶ 79    Under the one-act, one-crime rule, a court must first determine whether the defendant's conduct involved a single act or multiple acts. Multiple convictions are improper if they are based on the same physical act. *People v. Miller*, 238 Ill. 2d 161, 165 (2010) (citing *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996)). If the defendant's conduct involved multiple acts, the court must decide whether any of the offenses are lesser-included offenses. Multiple convictions are also improper if an offense is a lesser-included offense. *Miller*, 238 Ill. 2d at 165 (citing *Rodriguez*, 169 Ill. 2d at 186).

¶ 80    As explained above, we have affirmed defendant's conviction of aggravated vehicular hijacking. The aggravated vehicular hijacking and vehicular invasion charges are based on the same physical act. The State concedes that defendant's conduct was not apportioned into two separate acts either in the indictment or in the arguments at trial. See *In re Samantha V.*, 234 Ill. 2d 359, 377-78 (2009) (findings

- 22 -

of guilt for multiple offenses can only be sustained if the charging instrument reflects the State's intent to apportion the defendant's conduct and prosecute for multiple crimes). We therefore agree with the parties that defendant's vehicular invasion conviction must be vacated under the one-act, one-crime rule. Accordingly, we need not address defendant's alternative argument that the State failed to prove the "force" element of that offense.

¶ 81                           F. Extended-Term Sentences

¶ 82      Finally, defendant contends that the trial court erred in imposing extended-term sentences for offenses not included in the most serious class of felony. The State concedes error on this point.

¶ 83      Section 5-8-2(a) of the Unified Code of Corrections authorizes extended-term sentences based on certain aggravating factors. 730 ILCS 5/5-8-2(a) (West 2006). The imposition of extended-term sentences is limited, however, to offenses within the most serious classification. *People v. Jordan*, 103 Ill. 2d 192, 205-06 (1984). An exception to that rule applies when extended-term sentences are imposed "on separately charged, differing class offenses that arise from unrelated courses of conduct." *People v. Coleman*, 166 Ill. 2d 247, 257 (1995).

¶ 84      In this case, the parties agreed, and the appellate court found, that the offenses were committed in a single course of conduct. We agree and, therefore, conclude that an extended-term sentence may be imposed only on offenses within the most serious class of felony. Defendant was sentenced to an extended term of 50 years' imprisonment for aggravated vehicular hijacking, a Class X felony. The trial court also imposed extended-term sentences on the remaining convictions for Class 1 and Class 2 felonies. The extended-term sentences for the Class 1 and Class 2 felonies were improper.

¶ 85      The parties further agree that the appropriate remedy in this case is to affirm the extended-term sentence on the most serious offense and reduce the sentences on the lesser class felonies to the maximum nonextended term. See *People v. Ware*, 2014 IL App (1st) 120485, ¶ 32 (when a trial court imposes an extended-term sentence improperly, but the record establishes that the court intended to impose the maximum sentence available, a reviewing court may exercise its power under

Illinois Supreme Court Rule 615(b)(4) and reduce the sentence to the maximum nonextended term). Here, the trial court imposed the maximum extended-term sentences for the Class 1 and Class 2 felonies. Thus, the trial court clearly intended to sentence defendant to the maximum term available for those offenses. Accordingly, we reduce defendant's sentence for attempted armed robbery, a Class 1 felony, to the maximum nonextended term of 15 years' imprisonment (730 ILCS 5/5-8-1(a)(4) (West 2006)), and we reduce defendant's sentence for escape, a Class 2 felony, to the maximum nonextended term of 7 years' imprisonment (730 ILCS 5/5-8-1(a)(5) (West 2006)). Defendant's extended-term sentence for aggravated vehicular hijacking is affirmed.

¶ 86                                    III. CONCLUSION

¶ 87        For the above reasons, we reverse the appellate court's judgment reversing defendant's conviction of aggravated vehicular hijacking. Defendant's conviction of vehicular invasion is vacated. Defendant's extended-term sentence for aggravated vehicular hijacking is affirmed, and his sentences for attempted armed robbery and escape are reduced to the maximum nonextended terms. The appellate court's judgment is otherwise affirmed.

¶ 88        Appellate court judgment affirmed in part and reversed in part.

¶ 89        JUSTICE BURKE, concurring in part and dissenting in part:

¶ 90        The majority reverses the appellate court judgment, which reversed defendant's conviction for aggravated vehicular hijacking. 720 ILCS 5/18-4(a)(3) (West 2006). Reinstating this conviction, the majority now holds that the offense of vehicular hijacking (720 ILCS 5/18-3(a) (West 2006)) may be committed when a person commandeers or takes control over a vehicle by use of force or threat of force, even though the victim is not dispossessed of the vehicle. I disagree with the majority's interpretation of the vehicular hijacking statute and, therefore, respectfully dissent.

¶ 91        Section 18-3(a) of the Criminal Code of 2012 defines the offense of vehicular hijacking and provides that the offense is committed when a person "takes a motor

vehicle from the person or the immediate presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18-3(a) (West 2006). Relying on our decision in *People v. Strickland*, 154 Ill. 2d 489 (1992), the appellate court held that the "taking" element of the offense of vehicular hijacking is not satisfied where, as here, the defendant has not taken actual physical possession of the vehicle away from the person or presence of the owner or driver of the vehicle. 2015 IL App (1st) 120654, ¶ 67. I would affirm that holding.

¶ 92    In *Strickland*, the defendant and his brother approached a man who was sitting in a parked car. They got into the car and ordered the man, at gunpoint, to drive them to California. The man drove instead to Chicago, where the two defendants were subsequently arrested and charged with several offenses, including armed robbery. *Strickland*, 154 Ill. 2d at 499-500. The robbery statute, at that time, provided that "[a] person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force." Ill. Rev. Stat. 1985, ch. 38, ¶ 18-1(a). The term "property" included motor vehicles, and absent certain special circumstances, the offense was designated a Class 2 felony.

¶ 93    The defendant was convicted, and on appeal, he argued that he was not guilty of armed robbery because the vehicle was never taken from the driver's possession. We agreed and reversed the defendant's conviction. Interpreting the phrase "takes *** from the person or presence of another," we held that the offense required proof that the owner was dispossessed of his property. *Strickland*, 154 Ill. 2d at 525-26. We acknowledged that "the Stricklands' actions certainly denied [the vehicle owner] a large measure of control over his vehicle." *Id.* at 526. Nevertheless, we held that this was insufficient to establish the "taking element" of the offense. *Id.*

¶ 94    In 1993, approximately one year after *Strickland* was decided, the legislature amended article 18 of the Criminal Code of 1961. Section 18-1, the general robbery statute, was amended to exclude motor vehicles from its scope, providing that "[a] person commits robbery when he or she takes property, except a motor vehicle covered by Section 18-3 or 18-4, from the person or presence of another by the use of force or by threatening the imminent use of force." Pub. Act 88-351 (eff. Aug. 13, 1993) (amending 720 ILCS 5/18-1). At the same time, sections 18-3 and 18-4

were added to Article 18, creating the new offenses of vehicular hijacking and aggravated vehicular hijacking (*id.* (adding 720 ILCS 5/18-3, 18-4)) and increasing the penalty for vehicular hijacking to a Class 1 felony (*id.* (amending 720 ILCS 5/18-3(c)). Importantly, however, the legislature continued to use the exact same terminology in the vehicular hijacking statute as was contained in the general robbery statute. Section 18-3(a) provided that the offense of vehicular hijacking is committed "when [a person] takes a motor vehicle from the person or the immediate presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18-3(a) (West 1994).

¶ 95     The fact that the identical language was used is significant because the legislature is presumed to be aware of judicial decisions interpreting legislation. *Pielet v. Pielet*, 2012 IL 112064, ¶ 48. Thus, if the legislature amends a statute or enacts new legislation after a judicial decision is published, it must be presumed that the legislature acted with knowledge of our interpretation. *Morris v. William L. Dawson Nursing Center, Inc.*, 187 Ill. 2d 494, 499 (1999); *People v. Hickman*, 163 Ill. 2d 250, 262 (1994). Moreover, if the legislature reenacts a statute without modification it is assumed that any construction of the statutory language by this court will continue to be in effect. *Williams v. Crickman*, 81 Ill. 2d 105, 111 (1980); *People ex rel. Klaeren v. Village of Lisle*, 316 Ill. App. 3d 770, 782 (2000). Furthermore, considerations of *stare decisis* weigh heavily in the area of statutory construction, especially where the legislature is free to change court interpretations of its legislation. *Williams*, 81 Ill. 2d at 111.

¶ 96     Here, we must presume that the legislature was aware of our interpretation of the "taking" language in *Strickland* when it created the new offense of vehicular hijacking and used the identical language that was interpreted in *Strickland*. Applying the well-established principles of statutory construction set forth above, we must find the legislature's choice to repeat the identical language used in the robbery statute, when it defined vehicular hijacking, signified its intention to give the vehicular hijacking statute the same meaning. For this reason, the meaning of the statutory language at issue here is unambiguous. It means exactly what we held in *Strickland*.

¶ 97     Today, however, the majority interprets the vehicular hijacking statute and holds that the statutory language "plainly" means something else. *Supra* ¶¶ 40-41.

The majority rejects our plain language interpretation of the statutory phrase "takes *** from the person or presence of another," which we adopted 25 years ago in *Strickland*, and now expands the meaning of "takes" to include taking control over or commandeering a vehicle—the exact interpretation we rejected in *Strickland*. The majority's only explanation for rejecting the settled meaning of the statutory language is that the legislature "removed motor vehicles from the [general] robbery statute and created an entirely new offense entitled 'vehicular hijacking.' " *Supra* ¶ 39. In other words, according to the majority, the title of the statute has changed the plain meaning of the substantive text. Because this conclusion is contrary to well-established principles of statutory construction, I cannot agree.

¶ 98    An offense is defined not by its title but by the substantive language of the statute that constitutes the elements of the offense. As the appellate court below recognized, the title or heading of a statute cannot alter the plain meaning of the text. 2015 IL App (1st) 120654, ¶ 79 (citing *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 505-06 (2000)). The title of a statute can only be used to shed light on an ambiguous word or phrase. *Id.* Here, there is no ambiguity. The meaning of the text within the vehicular hijacking statute was already settled when the statute was enacted. Giving the statute the name "vehicular hijacking" does not change the plain and established meaning of the text within. By reaching the conclusion it does, the majority calls into question the continued validity of established rules of construction.

¶ 99    I am well aware that the word "hijacking" has a certain connotation, and therefore, the temptation to attach an expanded meaning to the statute is understandable. However, it is this court's obligation to interpret statutes in accord with legislative intent. It is not our job to rewrite statutes. Based on the analysis above, I believe we are bound by our rules of construction and *stare decisis* to interpret the vehicular hijacking statute in accord with the longstanding interpretation of the language contained therein. To interpret the vehicular hijacking statute as the majority does is not only to read into the statutory language a meaning that is not there but to affirmatively adopt a meaning that previously was expressly rejected. In short, we cannot conclude that the legislature "plainly intended" something different than what we said in *Strickland* simply because the statute is titled "vehicular hijacking."

¶ 100    Because I would affirm the appellate court's reversal of defendant's aggravated vehicular hijacking conviction, I would also find that defendant's conviction for vehicular invasion may stand. Therefore, I also dissent from the majority's decision to vacate that conviction. In all other respects, I agree with the majority and, therefore, would affirm the appellate court judgment on the remaining issues.