2019 IL App (1st) 163399-U

No. 1-16-3399

Order filed December 23, 2019

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 5619 |
| | ) | |
| LAQUAUN PERKINS, | ) | Honorable |
| | ) | Thomas M. Davy, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PIERCE delivered the judgment of the court.
Presiding Justice Griffin and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for attempt first degree murder is affirmed where the trial court did not admit hearsay statements and the evidence was sufficient to prove him guilty beyond a reasonable doubt of attempt first degree murder. Defendant's conviction for aggravated battery is vacated under the one-act, one-crime rule.

¶ 2    Following a bench trial, defendant Laquaun Perkins was convicted of attempt first degree murder, armed robbery, and aggravated battery, and sentenced to three concurrent 18-year prison terms. On appeal, defendant argues (1) the trial court erroneously admitted hearsay statements, (2)

counsel was ineffective for failing to preserve objections to the hearsay statements, (3) the evidence was insufficient to convict defendant of attempt first degree murder,[1] and (4) his conviction for aggravated battery violated the one-act, one-crime rule. For the following reasons, we affirm in part and vacate in part.

¶ 3    Defendant was charged by indictment with four counts of attempt first degree murder, four counts of armed robbery, and two counts of aggravated battery. Relevant here, count I alleged defendant committed attempt first degree murder "in that he, without lawful justification, with intent to kill, did an act, to wit: shot Frank Campbell while armed with a firearm, which constituted a substantial step towards the commission of the offense of first degree murder." 720 ILCS 5/8-4(a) (West 2012); 720 ILCS 5/9-1(a)(1) (West 2012). Count IX alleged defendant committed aggravated battery "in that he, in committing a battery, knowingly discharged a firearm, *** and caused any injury to another person, to wit: Laqua[u]n Perkins shot Frank Campbell about the body." 730 ILCS 5/12-3.05(e)(1) (West 2012).

¶ 4    At trial, Frank Campbell testified that on February 13, 2013, about 2:30 p.m., he was walking on Clyde Avenue with his friend, Jimmy Greenhill. Campbell had just cashed checks from his job and income tax and was carrying $550. Near the intersection of 95th Street and Clyde, two men approached Campbell and Greenhill and asked if they belonged to the LAFA gang. In court, Campbell identified one of the men as defendant. Campbell said he did not belong to the gang and continued walking with Greenhill, but defendant and the other man followed and threatened to rob them. From a foot or two away, defendant "upped" a black .38-caliber revolver and said, "if you

---

[1] Defendant does not challenge the sufficiency of the evidence to convict him of armed robbery and aggravated battery.

try and hit me or anything I'ma shoot you." Campbell and Greenhill separated, with defendant trailing Campbell and the other assailant trailing Greenhill.

¶ 5    Campbell walked to his godmother's house, located nearby. He went up the stairs to her home and rang her bell, but no one answered, so he went back down. Defendant stood at the bottom of the stairs, holding the revolver low and close to his side. When Campbell and defendant were face-to-face, defendant said "give me everything." Campbell handed defendant the $550. Defendant grabbed the money and tried to hit Campbell across the forehead with the revolver. Campbell reached for the revolver, and defendant backed up, said "F*** it," and shot Campbell in the thigh. Campbell went "in and out of consciousness" until an ambulance arrived. On February 14, 2013, officers visited Campbell in the hospital and showed him a photo spread. Campbell identified defendant as the person who robbed and shot him.

¶ 6    Greenhill testified that one of the men following him and Campbell wore a hood over his head, and the other held a firearm. The armed man threatened to shoot Greenhill and Campbell if they ran. The hooded man led Greenhill to the sidewalk, while Campbell and the armed man crossed the street. When the hooded man looked away, Greenhill ran towards a nearby store to call the police.

¶ 7    On the way, Greenhill saw his friend, Shantell Burnett, in her vehicle and informed her that Campbell was being robbed. Burnett drove in Campbell's direction. Greenhill entered the store but was told the phones did not work, so he left. As he stepped outside, he heard a gunshot. Greenhill ran to Campbell and found him lying in blood. Later, at a show-up near the scene of the shooting, Greenhill sat in a police car and viewed a suspect, but could not identify him as either assailant.

¶ 8     Burnett testified that she had a pending felony charge for aggravated cruelty to animals, a felony conviction for unlawful use of another person's credit card, and a misdemeanor conviction for retail theft. On February 13, 2013, she was in her car near 95th and Clyde and saw Greenhill, who told her that Campbell was being robbed. Burnett drove to the 9500 block of South Clyde and saw defendant, whom she identified in court, "tussling" with Campbell. Defendant had Campbell's hood in his mouth, and wore a dark hoodie with his head uncovered and his hair in short braids.

¶ 9     Burnett drove onto the grass to scare defendant off. Then, Burnett exited the car and ran behind defendant, pulling him into a "bear hug" and telling him to release Campbell. Defendant did not let go of Campbell, so Burnett punched defendant's right eye and he fled.

¶ 10    Burnett approached Campbell and saw blood coming through his pants. She then noticed a firearm on the ground and threw it behind them on the grass. Burnett used Campbell's phone to call 911, and an ambulance took Campbell away. Later, police officers took Burnett to a show-up on the same block as the shooting. As Burnett sat in a squad car with tinted windows, officers brought defendant to the car and asked her if he robbed and shot Campbell. Although she recognized defendant, Burnett first said no because she was scared. About a minute later, she felt guilty and identified defendant as Campbell's assailant.

¶ 11    Officer Thomas Kocanda testified that on February 13, 2013, about 2:31 p.m, he and his partner, Officer Jim Sherlock, responded to a call of shots fired on the 9500 block of South Clyde. The dispatcher described a black male with braids and a black hoodie running westbound from Clyde. As the officers approached 95th and Jeffrey Avenue, a woman at the bus shelter asked if they were looking for somebody. She stated that "a young man with braids wearing a black hoodie appeared panicked and out of breath [and] just got on the CTA bus that was heading northbound."

The officers stopped a bus in that direction and saw someone matching the suspect's description, whom Kocanda identified in court as defendant. Defendant told the officers that he boarded at 87th Street, but the bus driver said defendant boarded at 95th and Jeffrey. The officers arrested defendant, brought him to 96th Street and Clyde for a show-up, and took him to the police station. Officer Mayer[2] performed a custodial search of defendant, recovering approximately $550 from his pants pocket, some of which appeared to have blood on it.

¶ 12     The State entered stipulations that when paramedics found Campbell, he was unconscious and had "lost a large amount of blood." Campbell required emergency surgery for a gunshot wound to his "right groin/thigh with profuse arterial injury and bleeding," and was hospitalized until February 17, 2013. Following defendant's arrest, police administered a gunshot residue kit which showed that defendant either discharged a firearm, contacted an item with primer gunshot residue, or had his left hand in the environment of a discharged firearm. Forensic scientists determined that Campbell was not the source of blood found on defendant's jeans and most of the cash, although one bill had a "mixture" of DNA "not suitable for comparison."

¶ 13     The defense called Sherlock, who testified that he and Kocanda removed defendant from a bus between the 83rd and 85th blocks of Jeffrey.

¶ 14     On cross-examination, Sherlock stated that while he and Kocanda were looking for the suspect, a woman waved them down to talk. Defendant objected to the woman's statement as hearsay. The State responded that the "conversation came in without objection" during Kocanda's testimony and related to the officers' course of conduct. The following colloquy occurred:

---

[2] Officer Mayer's first name does not appear in the record.

"[DEFENSE COUNSEL]: Your Honor, if I missed it before, I am still going to object at this point in time because it's hearsay.

THE COURT: I will sustain the objection as to the content of the conversation. It did come out through the testimony of Officer Kocanda and it was being offered to explain the actions of Officer Sherlock and Kocanda, so I will sustain the objection at this point as to the content."

¶ 15  Sherlock further testified that after speaking with the woman, the officers looked for bus 1003 on CTA route number 15. Upon boarding the bus, Sherlock saw defendant, whom he identified in court and who matched the suspect's description. Defendant "looked very nervous," and had what appeared to be blood on his pants and a black or swollen eye. The State asked whether the driver told Sherlock where defendant boarded the bus, and defense counsel objected on the basis of hearsay. The trial court sustained the objection as to "the content." Sherlock then testified that defendant claimed he boarded the bus at 87th and Jeffrey. The State asked whether defendant's statement "conflict[ed]" with information the officers already received, and defense counsel objected again. The trial court overruled the objection, explaining it would receive the testimony "only to explain the actions of the police, not the truth of what the bus driver might have said."

¶ 16  Detective Neals[3] testified that he interviewed Burnett after the shooting. Burnett told Neals that after defendant fled, she saw Campbell holding a silver and black revolver, which she took from him and threw away. To Neals' knowledge, a firearm was not recovered.

¶ 17  The trial court found defendant guilty on all charges. In its findings, the court stated that defendant and Campbell struggled over the firearm before defendant said "f*** it" and shot

_____

[3] Detective Neals's first name does not appear in the record.

Campbell in his groin area. Defendant continued to fight with Campbell until Burnett restrained and struck him, causing him to flee. The court also discussed Kocanda's testimony that the officers "went to a bus stop at 95th and Jeffrey, received some information, [and] followed the bus."

¶ 18    Defendant filed a motion for new trial, which did not raise the issue of hearsay testimony. The trial court denied the motion, and following a hearing, sentenced defendant to three concurrent 18-year prison terms for attempt first degree murder, armed robbery, and aggravated battery. At the sentencing hearing, the court rejected defendant's argument that because he did not shoot Campbell in the head, he did not intend to kill him. The court stated that "just about any time" a person fires a firearm at another from close range "would indicate *** an attempt to commit a murder."

¶ 19    On appeal, defendant first argues that he did not receive a fair trial where the trial court admitted hearsay statements from the woman at the bus shelter and the bus driver.

¶ 20    Initially, defendant concedes that, although he objected to Sherlock's testimony regarding the officers' conversations with the woman at the bus shelter and the bus driver, he did not object to Kocanda's testimony concerning those conversations and did not raise any objections in his posttrial motion. As a result, defendant has forfeited review of the alleged hearsay statements. See *People v. Reese*, 2017 IL 120011, ¶ 60 (a defendant must object both at trial and in a written posttrial motion to preserve an issue for review). Defendant urges us to review his claim under the plain error doctrine. Alternatively, he asserts that his counsel was ineffective for failing to preserve a challenge to the inadmissible hearsay.

¶ 21    The plain error doctrine allows the appellate court to review unpreserved claims of error when a clear or obvious error occurred, and either (1) "the evidence is so closely balanced that the

error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Our first step is to determine whether the trial court erred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 22    Hearsay is an out-of-court statement offered to prove the truth of the matter asserted, and is generally inadmissible. *People v. McLaurin*, 2015 IL App (1st) 131362, ¶ 42. An out-of-court statement is not hearsay where it is offered for the " 'limited purpose of showing the course of a police investigation where such testimony is necessary to fully explain the State's case.' " *People v. Irwin*, 2017 IL App (1st) 150054, ¶ 29 (quoting *People v. Williams*, 181 Ill. 2d 297, 313 (1998)). Therefore, "the State may not use the limited investigatory procedure exception to place into evidence the *substance* of any out-of-court statement that the officer hears during his investigation, but may only elicit such evidence to establish the police investigative process." (Emphasis in original.) *People v. Ochoa*, 2017 IL App (1st) 140204, ¶ 41. Where, as here, the trial judge is the trier of fact and "evidence is admissible for a limited purpose, it is presumed that the trial judge *** considered it only for that proper purpose." *People v. Avery*, 227 Ill. App. 3d 382, 389 (1991).

¶ 23    Generally, evidentiary rulings are reviewed under an abuse of discretion standard. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). Defendant argues we should instead review this issue *de novo* because the surrounding facts are not in dispute and the only question is one of law. This exception to the general rule applies in cases where "a trial court's exercise of discretion has been frustrated by an erroneous rule of law." (Internal quotation marks omitted.) *People v. Anderson*, 2017 IL App (1st) 122640, ¶ 49. In this case, however, defendant does not contend that the course-of-

investigation rule was inapplicable to the woman's and bus driver's statements as a matter of law. Rather, defendant argues the trial court erroneously allowed the State to use the rule to introduce those statements for the truth of the matter asserted. That implicates an exercise of judicial discretion, so we will apply the abuse of discretion standard on review. See *id.* An abuse of discretion occurs when the court's determination is "arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Leak*, 398 Ill. App. 3d 798, 824 (2010).

¶ 24    In the case at bar, the officers did not merely testify that information they received from the woman at the bus shelter and the bus driver led them to board the bus and apprehend defendant. Instead, the officers testified that the woman told them that "a young man with braids wearing a black hoodie appeared panicked and out of breath [and] just got on the CTA bus that was heading northbound," and the bus driver said that defendant boarded at 95th and Jeffrey. Thus, the challenged testimony included the substance of the officers' conversations.

¶ 25    The trial court, however, expressly limited the purpose of the statements to showing the officers' course of investigation. When defendant objected to Sherlock's testimony that the woman stated that a panicked man with braids boarded the bus, the court responded that it received the statement only to explain the officers' actions. When the court announced its verdict, it again emphasized its proper use of the woman's statement to explain the officers' actions by simply stating that the officers went to a bus stop, received some information, and followed a bus.

¶ 26    Similarly, the court did not improperly use the bus driver's statement. Sherlock testified that the bus driver stated defendant boarded at a certain stop, which conflicted with where defendant said he boarded. Defendant objected, and in response, the court repeated that it was only

receiving the testimony to explain the officers' actions, and was not accepting it for the truth of what the bus driver said. While defendant did not object to Kocanda's earlier testimony about the same statements by the woman and the bus driver, the court stated that it received both officers' testimony only "to explain the[ir] actions." Because the court expressly refused to use the evidence for an improper purpose, no error occurred. As such, plain error review is unmerited. See *Thompson*, 238 Ill. 2d at 613. Because there was no error, we need not discuss defendant's ineffective assistance of counsel claim. See *People v. Land*, 2011 IL App (1st) 101048, ¶ 146 (declining to consider ineffective assistance of counsel claim where there was no error).

¶ 27 Defendant next argues that the State did not prove him guilty of attempt first degree murder because he lacked the specific intent to kill.

¶ 28 In a challenge to the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. The trier of fact has the responsibility to determine the credibility of witnesses, weigh the evidence and any derived inferences, and resolve any conflicts in the evidence. *Id.* "[A] reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of evidence or the credibility of witnesses." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009). We will not overturn a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that a reasonable doubt remains as to defendant's guilt. *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 29 Relevant here, a person commits first degree murder where he, with intent to kill an individual, does so without lawful justification. 720 ILCS 5/9-1(a)(1) (West 2012). A person

commits attempt first degree murder where he, with intent to commit murder, takes a substantial step towards committing murder. 720 ILCS 5/8-4(a) (West 2012). "Proof of a specific intent to kill is a necessary element of the offense." *People v. Vega*, 2018 IL App (1st) 160619, ¶ 41. Specific intent to kill may be shown by the circumstances surrounding the defendant's act, including the use of a deadly weapon and the character of the assault. *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52. We have noted that discharging a firearm at another person supports the conclusion that the person doing so had the intent to kill. *Vega*, 2018 IL App (1st) 160619, ¶ 41.

¶ 30   The evidence at trial, viewed in the light most favorable to the State, was sufficient for the trial court to find that defendant had the specific intent to kill Campbell. Defendant approached Campbell on the street and asked his gang affiliation, displayed a firearm, and said, "if you try and hit me or anything I'ma shoot you." Defendant then followed Campbell to his godmother's house. After taking Campbell's cash, defendant tried to hit Campbell in the forehead with the firearm. When Campbell attempted to wrest the firearm from defendant, defendant stepped back, said "F*** it," and shot Campbell in the thigh and groin area from a close distance. From these facts, the trial court drew the reasonable inference that defendant shot Campbell with the intent to kill.

¶ 31   We reject defendant's argument that had he wanted to kill Campbell he would have shot him "multiple times and somewhere other than his leg." Neither abandonment nor poor marksmanship is a defense to attempted murder. *People v. Mitchell*, 105 Ill. 2d 1, 10 (1984); *People v. Green*, 339 Ill. App. 3d 443, 452 (2003). "[T]he fact that an assailant, armed with a deadly weapon, chooses to flee *** rather than choosing to inflict a fatal injury, does not negate the existence of the intent to kill." *People v. Maxwell*, 130 Ill. App. 3d 212, 217 (1985).

¶ 32 Here, defendant shot Campbell near the groin, causing "profuse arterial injury and bleeding," and continued to struggle with Campbell after this first shot until Burnett drove her vehicle off the street, wrapped her arms around defendant, and punched him in the eye. A rational trier of fact could infer that defendant intended the gunshot to kill Campbell, and that Burnett's timely intervention prevented defendant from firing again. Under these circumstances, we will not substitute our judgment for that of the trier of fact. See *People v. Stanford*, 2011 IL App (2d) 090420, ¶ 41 ("Evidence of a defendant's firing a firearm once would be sufficient to support the inference of intent to kill."). Thus, we will not overturn the trial court's verdict. See *Belknap*, 2014 IL 117094, ¶ 67.

¶ 33 In reaching our decision, we are not persuaded by defendant's assertion that the trial court placed too much emphasis on the fact that defendant discharged a firearm from a close range based on its comment at the sentencing hearing that "just about any time" one person shoots another at close range "would indicate *** an attempt to commit a murder." Defendant's claim ignores that in the court's findings, it carefully considered all of the circumstances of the offense, expressly discussing the fight over the firearm, defendant's conduct before and after the shooting, and defendant's aim. Therefore, defendant fails to establish that the court erred in reaching its decision.

¶ 34 Finally, defendant argues, and the State concedes, that his aggravated battery conviction must be vacated pursuant to the one-act, one-crime rule.

¶ 35 Defendant acknowledges that he forfeited this issue by failing to raise it in a posttrial motion. See *Reese*, 2017 IL 120011, ¶ 60. However, because one-act, one-crime violations affect the integrity of the judicial process, they are properly reviewed under the second prong of the plain error doctrine. *People v. Coats*, 2018 IL 121926, ¶ 10.

¶ 36 The one-act, one-crime rule provides that a criminal defendant may not be convicted of multiple offenses when those offenses are based on the same physical act. *Id.* ¶ 11. In evaluating whether multiple convictions violate the rule, we first ascertain whether the defendant's conduct consisted of a single physical act or separate acts. *Id.* ¶ 12. Multiple convictions are improper if they are based on the same physical act. *Id.* ¶ 11. However, if the charges are based on multiple physical acts, we then determine whether any of the offenses are lesser-included offenses. *Id.* ¶ 12. If none are lesser-included offenses, then multiple convictions are proper. *Id.* This presents a question of law, which we review *de novo*. *Id.*

¶ 37 We find that defendant's convictions for attempt first degree murder and aggravated battery violate the one-act, one-crime rule. In the charging instrument, count I alleged defendant committed attempt first degree murder "in that he, without lawful justification, with intent to kill, did an act, to wit: shot Frank Campbell." 720 ILCS 5/8-4(a) (West 2012); 720 ILCS 5/9-1(a)(1) (West 2012). Similarly, count IX alleged defendant committed aggravated battery "in that he, in committing a battery, knowingly discharged a firearm, *** and caused any injury to another person, to wit: *** shot Frank Campbell." 730 ILCS 5/12-3.05(e)(1) (West 2012). The evidence showed that defendant only shot Campbell once. Because both counts are based on the same physical act of defendant shooting Campbell, multiple convictions are improper. See *Coats*, 2018 IL 121926, ¶ 11. Accordingly, we vacate defendant's conviction for aggravated battery, and otherwise affirm the judgment of the trial court.

¶ 38 Affirmed in part; vacated in part.